**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

Alexandria Division

| | |
|---|---|
| IN RE:<br><br>AIR CRASH INTO THE JAVA SEA<br>ON JANUARY 9, 2021 | MDL No. 1:23MD3072 |

## Notice, Additional Authorities, and Offer of Proof for October 2, 2023, Hearing

**1. Notice**

Illinois plaintiffs have met and conferred with Boeing and have offered targeted interrogatories and requests for production for purposes of the FNC motion.[1] In addition, Illinois plaintiffs have asked Boeing to allow them the opportunity to depose their affiants as to the statements they have made in their affidavits. A copy of the targeted interrogatories and requests for production are attached to this notice as Exhibit 1.

The deposition proposed is an 8-hour deposition for each of them where one attorney deposes the affiant on Zoom. In addition, they have asked Boeing to provide the documents the affiant has relied on in making the statements they have made in their affidavit.

Boeing intends to respond to these requests over the weekend.

---

[1] Because the Court allowed Illinois plaintiffs to join Virginia plaintiff's opposition to the FNC motion, Dkt. 55, and that motion asked for discovery, Dkt. 26, the interrogatories and requests for production which were narrowed down from their original form are in the Court's possession. See Dkts. 31.5 and 31.6. The purpose of the meet and confer was because Boeing stated in its opposition to that they were "…open to considering targeted forum non conveniens discovery…" Dkt. 30, p. 2.

1

## 2. Additional Authorities

Illinois plaintiffs bring two additional authorities to the Court's attention in support of granting discovery with respect to Boeing's FNC motion. *Home Ins. Co. v. Thomas Indus., Inc.*, 896 F.2d 1352, 1355 (11th Cir. 1990); *Deb v. SIRVA, Inc.*, 832 F.3d 800, 809 (7th Cir. 2016).

Without any discovery, Illinois plaintiffs, all of which have signed this pleading, declare under penalty of perjury to this Court that they cannot present all essential facts to oppose Boeing's FNC motion. See Federal Rule of Civil Procedure 56(d).

## 3. Offer of Proof

Nevertheless, they do offer essential facts to this Court in support of discovery and their opposition to the FNC motion. Rather than read these facts into the record on October 2, 2023, on information and belief, Illinois plaintiffs submit them in writing to the Court.

They do so to establish that the proper venue for this action is the United States of America because all the documents and evidence proffered to below are in Boeing's possession, and these documents and evidence represent the theory of plaintiffs' case in chief and more important of the immense American public interest involving a defendant like Boeing:

1. In 1994, Boeing issued Service Letter (SL) number 737-SL-76-016-A to recommend troubleshooting procedures for intermittent thrust lever response during A/T operation with respect to this aircraft model.
2. On 21 October 1998 Boeing issued a Service Letter (SL) number 737-SL-22-039 because there was a problem with this

2

aircraft's thrust level movement caused by irregular auto throttle operation which results in asymmetric thrust conditions causing the airplane to bank excessively and going into a roll.

3. In 2001, the FAA informed Boeing that 737 aircrafts operators to replace the automatic throttle computer after reports of unequal thrust.

4. It was during this same year that Boeing moved its headquarters from Seattle, Washington to Chicago, Illinois, a decision that angered rank-and-file mechanics and engineers because the company renowned as an engineering-driven company that made the best, safest planes shifted its focus to profits because it was losing the commercial race in producing airplanes to its competitor Airbus.

5. On April 30, 2003, Boeing issued another service letter to advise the operator of this aircraft to incorporate a new auto-throttle computer.

6. In June 2007, Boeing obtained information that a 737-500 landing in Ireland rapidly lost altitude when its auto-throttle inexplicably shut-off.

7. In September 2007, Boeing obtained information that the auto-throttle inexplicably disconnected on another plane in Hampshire, England.

8. On or about February 25, 2009, Boeing obtained information and was directly involved in an investigation of a Boeing 737-800 crash in Amsterdam because of an auto-throttle malfunction.

9. In or around June 2011, Boeing began developing and marketing a new version of its Boeing 737 called the 737 MAX.

10. In 2012, Boeing's own test pilots spent more than 10 seconds during a simulator test to respond to MCAS activation on the 737 Max. The pilot found this catastrophic, and Boeing did not inform the FAA or purchasers of the aircraft about this test data.

11. In April 2012, the SJY-182 Aircraft was transferred to Indonesia.

12. After the sale of the accident aircraft, defendant Boeing provided further after-sale service, instruction and advice for the maintenance and operation of the accident aircraft and the training of aircraft flight crews.

13. On or about July 6, 2013, a Boeing 777 crashed on approach to San Francisco when the auto-throttle failed to maintain sufficient speed, and the NTSB found that Boeing failed to provide instructions on its auto-throttle system, and all that information and documents associated with that crash are in Boeing's possession in the United States.

14. Boeing generated and produced discovery to its attorneys, attorneys who represent Boeing in this case related to the auto-throttles design, manufacture, and after market sale.

15. Shortly after the 777 crash on July 6, 2013, in a lead-up to the conspiracy and scheme to defraud the United States in the design and manufacture of the Boeing 737-

4

      Max, a series of e-mails were discovered by the Department of Justice that were sent on or about 2014.

16. Those e-mails revealed that Boeing's employees who were responsible for the design and safety of airplanes saw profits as more of a priority than the safety of its product and were ensuring that their actions did not jeopardize Boeing's bottom line.

17. On or about early 2014 when those e-mails were exchanged, Boeing received information that its auto-throttles on Boeing 737 aircrafts needed to be updated.

18. On or about 2014, Boeing marketed its 737 Max aircraft to foreign airlines telling them no specialized training was necessary for their pilots to transition flying their 737 Max fleet.

19. On or about August 2016, Boeing's employees discussed the fact they had received positive affirmation and confirmation from Boeing's management that their choices, choices which prioritized profits over safety, made management "VERY HAPPY," in the way they designed 737-Max to market.

20. Those decisions focused on prioritizing profits over safety, and beginning in and around November 2016 through at least in and around December 2018, led Boeing, through its employees, to knowingly, and with intent to defraud, to conspire to defraud the United States Government with respect to the design of the 737-Max aircraft.

21. For example, in May and June 2017, Boeing specifically targeted foreign countries who purchased its 737-Max

aircraft and opposed training their pilots to fly the plane and in fact successfully talked one foreign carrier from getting the training their pilots needed to safely fly the 737-Max aircraft.

22. In June 2017, Boeing employees called an Indonesian airline who wanted to learn how to operate its 737-Max stupid remarking: "Now, freaking Lior Air might need a sim to fly the MAX and maybe because of their own stupidity. I'm scrambling to figure out how to unscrew this now."

23. This bias towards foreigners and foreign airlines continued into December 2017 when a Boeing employee remarked that he made a foreign airline feel stupid about trying to understand how to use and properly operate the 737 Max.

24. The bias was so explicit that the Boeing employee referred to the foreign airline as "fools," further remarking that he saved Boeing "sick amount of $$$$," by the manner in which it treated the foreign airline.

25. Boeing behaved this way because it wanted to conceal facts from the United States Government and foreign airlines since those facts would be detrimental to its ability to make profit from the sales of its aircraft.

26. Consequently, on October 29, 2018, a 737-Max operating as Lion Air Flight 610 crashed in Indonesia because Boeing concealed facts necessary to operate the aircraft safely.

27. Rather than accept responsibility for its behavior, Boeing blamed the pilot: maintained the position that its behavior was justified and further maintained that the

6

facts it concealed from an Indonesian airline did not affect the knowledge, skills, abilities of a pilot who flew this plane.

28. Consequently again, on March 10, 2019, another 737-Max operating as Ethiopian Airlines Flight 302 crashed for the same reasons.

29. All information and evidence related to the Ethiopian Airlines Flight 302 case are currently in Chicago because there is a case proceeding to trial there in front of the Honorable Jorge L. Alson in the United States District Court for the Northern District of Illinois.

30. Approximately a year after the Ethiopian Airlines Flight 302 crash, on March 23, 2020, the SJY-182 aircraft was parked due to the coronavirus pandemic.

31. On July 24, 2020, Boeing received a warning regarding corrosion of air check valves on planes including the aircraft at issue in this case - a warning which informed them to not operate planes until inspections were concluded.

32. This warning was given to Boeing during a period when it faced significant civil litigation because of both the Lion Air Flight 610 crash and the Ethiopian Airlines Flight 302 crash, a congressional inquiry, and more importantly while it was under criminal investigation for fraud because of both crashes.

33. On December 19, 2020, the SJY-182 aircraft resumed passenger service.

34. Between December 19, 2020, and January 7, 2021, numerous issues with the auto-throttle were reported with respect to SJY-182.

35. On a date prior to January 9, 2021, defendant Boeing prepared, published, and provided to Sriwijaya Airlines certain instructions and manuals for the maintenance and operation of the accident aircraft and the training of aircraft flight crews, including a Maintenance Manual (MM), a Quick Reference Handbook (QRH) and a Flight Crew Training Manual (FCTM).

36. The instructions and manuals, including the MM, did not provide any, or provided inadequate, instructions and advice as to the maintenance of the accident aircraft to prevent the autothrottle from causing the thrust lever for one engine to reduce while the thrust lever for the other engine remained the same, the defect which caused SJY-182 to crash.

37. The instructions and manuals, including the QRF and the FCTM, did not provide adequate instructions and advice as to recovery of the accident aircraft in the event of an upset which is the type of upset that contributed to the crash in this case.

38. When the autothrottle was subject to failure on January 3, and again on January 4, 2021, just days before the subject crash, nothing in Boeing's manuals provided guidance to the pilot as to how he should operate the aircraft to prevent it from crashing in the manner that it did in this case.

39. Moreover, the autothrottle was subject to the thrust lever for one engine reducing while the thrust lever for the other engine remained the same, resulting in significant differences in power being provided to the engines and causing an upset and a loss of control because the autothrottle as designed was defective.
40. On or about 2020 and until SJY-182 crashed, Boeing's resources were not focused on SJY-182's defects but rather focused on a criminal investigation being conducted by the FBI because which ultimately led to the Boeing's criminal indictment.
41. On or about January 7, 2021, Boeing was indicted for defrauding the United States government because it perpetuated a culture of concealment and fraud dating back to 2016.
42. Boeing entered into a deferred prosecution agreement with the United States Government.
43. Boeing generated and produced discovery to its attorneys who represent Boeing in that agreement, attorneys who represent Boeing in this case related to the auto-throttles design, manufacture, and aftermarket sale.
44. Approximately forty-eight hours after the deferred prosecution agreement and the indictment were publicized, the SJY-182 airplane crashed.
45. Boeing's employees exchanged correspondences, held meetings, and developed a response plan to respond to the SJY-182 crash.

46. Rather than accept responsibility for the defect, Boeing blamed the foreign pilots.

47. On January 22, 2021, Boeing's representatives traveled to England where tests were conducted on the auto throttle of this aircraft and 10 faults were found to have occurred on or about December 28-29, 2020, a week after the aircraft was put into service.

48. On 15 February 2021, Boeing issued a Flight Operation Technical Bulletin (FOTB) 737-12-2 Rev.1 regarding Airplane Upset Prevention and Recovery.

49. On or about February 2021, certain individuals approached some family members of those who lost loved ones on SJY-182.

50. After those meetings, some family members were asked to sign and did sign releases that discharged their right to bring any claim arising from this crash against the Boeing Company, Boeing Commercial Airplanes, and the airline.

51. The family members were not represented by an attorney.

52. The family members were still suffering from the emotional distress associated with losing a loved one in an airplane crash.

53. The releases were multi-paragraphed and contained complex legal terminology.

54. In exchange for their signatures, the families were paid approximately $97,000 United States dollars or 1,500,000,000.00 Indonesian Rupees in exchange for a decedent.

55. Only one payment per decedent was made.

56. Almost all of the money that was paid to them was part of a preexisting legal obligation that already existed under Chapter 8 Responsibility of Carrier; ¶ 2, Art. 141 which provides that an airline is strictly liable to pay victims of an air crash in an amount set by MOTR No. 77/2011 Articles 3 & 5.

57. This provision of Indonesian law is like a life insurance policy.

58. A family member who loses a loved one can collect money under Art. 141 by establishing that their loved one died in the crash and that they are the decedent's legal heir.

59. There is no need to sign a release releasing one's right to bring claims against companies to obtain this money.

60. The amount set by MOTR No. 77/2011 Articles 3 & 5 was approximately $81,000.00 or 1,250,000,000.00 Indonesian Rupees, i.e., this would represent the insurance proceeds available when an individual dies in a plane crash.

61. The difference between that amount and the amount paid is 250,000,000.00 Indonesian Rupees or approximately $15,000.00.

62. The releases signed by these families allow the Boeing Company, Boeing Commercial Airplanes, and the airline to avoid accountability in Indonesia.

63. Whoever presented the releases to the families believed that they had legal authority to name Boeing as a party to that agreement.

64. Others were approached but did not sign.

65. Family members are still being approached to sign releases even though those family members are represented by counsel in the United States.

66. Almost identical releases under similar circumstances were signed by family members following the Lion Air Flight 610 crash in Indonesia.[2]  A copy of one from that case is attached to this notice as Exhibit 2 for illustrative purposes.

67. Similar releases under different circumstances were relied on by Boeing in litigation in the Mandala Airlines Flight 091 crash which was adjudicated in the Northern District of Illinois. *Adiputra v. the Boeing* Company, 1:07-CV-00250, Dkt. 37, (N.D. I., October 26, 2007).  A copy of this release is also attached to this notice as Exhibit 3 for illustrative purposes.

68. On March 30, 2021, Boeing issued a message to operators of the 737-class series at issue in this case directing them to perform electronic checks of the auto-throttle computer to confirm the wire is connected within 250 flight hours.

69. The message was sent because engineers at Boeing identified a problem with the auto-throttle computer, a problem known for years, and directed Boeing to inform operators of the 737-class series to perform such checks.

---

[2] Beech Hannah and Suhartono Muktita, *Lion Air Crash Families Say They Were Pressured to Sign No-Suit Deal*, New York Times, March 21, 2019 available at https://www.nytimes.com/2019/03/21/world/asia/lion-air-crash-families-lawsuits.html.

70. Boeing is developing a service bulletin to issue additional fleet guidance on the flap synchro inspection.
71. On or about August 15, 2021, Boeing employees were involved with tests that were conducted on a 737-400 Boeing aircraft to correlate the relationship of the SJY-182 flight spoiler surface position to the flight spoiler position signal that is ultimately received by the autothrottle computer.
72. On December 7, 2021, Boeing's employees were involved with simulation exercises involving the same facts related to this crash in Henderson at the Las Vegas Flight Academy where pilots learn in the United States how to fly Boeing airplanes.
73. On December 9, 2021, Boeing employees were involved with tests that were conducted on its 737 aircraft. Specifically, these tests were conducted on a component that Boeing installed on the airplane in 1994 when it manufactured the aircraft.
74. On or about March 2022, Boeing conducted three monthly meetings with Sriwijaya regarding operational safety issues, took notes during those meetings, and corresponded with the airline.
75. On 25 March 2022, Boeing published a revision to the Maintenance Planning Document (MPD) for the 737-300/-400/-500 requiring repetitive inspections on the spoiler and aileron deployment and associated position sensors.
76. Boeing is developing a service bulletin to address a pending Airworthiness Directive mandate of an initial

inspection to be performed within 250 flight hours of the issuance of the service bulletin and repetitive tests of the spoiler deployment and aileron position sensing not exceeding a 2,000 flight hours interval.

77. On or about May 2022, Boeing announced its move to Arlington, Virginia, a move interpreted by many aviation experts, that Boeing has lost the commercial race in producing airplanes to its competitor Airbus.

78. On October 21, 2022, a federal judge, after hearing evidence and testimony, evidence and testimony confronted by Boeing found as follows: Had Boeing not committed its crime, the FAA AEG would have required Level D differences training for operators of the 737 MAX and would have included information related to MCAS in relevant training materials. As a result, foreign regulators—including Indonesian and Ethiopian authorities—would have issued similar training certifications and instructional materials, having taken their queue from the world's leading authority on aviation standards, the FAA. And ultimately, foreign operators of the 737 MAX—including the pilots on Lion Air Flight 610 and Ethiopian Airlines Flight 302—would have received training adequate to respond to the MCAS activation that occurred on both aircrafts. In sum, but for Boeing's criminal conspiracy to defraud the FAA, 346 people would not have lost their lives in the crashes.

79. Boeing's declarant, Mr. Mcintosh has worked at Boeing since 1991, this aircraft was manufactured in 1994.

14

80. All evidence related to the design, manufacture, assembly, testing, and certification of this aircraft is in the United States.

81. Illinois plaintiffs do not anticipate seeking any physical evidence located in Indonesia to prosecute their products liability action in the United States.

82. Illinois plaintiffs do not anticipate seeking to call any witness located in Indonesia to establish liability in their products liability action against Boeing.

Dated: September 29, 2023        Respectfully declared,

By:  /s/ Mohammad Hamoudi
        By Counsel
Pro Hac Vice
Charles Herrmann (WA Bar No. 6173)
Anthony Marsh (WA Bar No. 45194)
Mohammad Hamoudi (WA Bar No. 48512, CA Bar No. 273104)
HERRMANN LAW GROUP
505 5th Avenue South, Suite 330
Seattle, WA 98104
(206) 625-9104


By:  /s/ Thomas Patrick Routh
        By Counsel
Thomas Patrick Routh
Nolan Law Group
20 N Clark St 30th Floor
Chicago, Illinois 60602-5094
(312) 630-4000


By:   /s/ Floyd Wisner
        By Counsel
Floyd A. Wisner

15

Alexandra Wisner
Wisner Law Firm
161 N. Clark Street Suite 1600
Chicago, Illinois 60601
(312) 216-5168


By:  */s/ Sanjiv N. Singh*
         By Counsel
Sanjiv N. Singh
Sanjiv N. Singh, A Professional Law
Corporation
1700 S. El Camino Real Suite 503
San Mateo, CA 94402
(650) 389-2255
pro hac vice


By:  */s/ Michael B. Indrajana*
         By Counsel
Michael B. Indrajana
Indrajana Law Group, A Professional
Law Corporation
1700 S. El Camino Real Suite 503
San Mateo, CA 94402
(650) 597-0928
pro hac vice


By:  */s/ Vincent C. Mancini*
         By Counsel
Vincent C. Mancini
Reimer Dobrovolny & La Bardi PC
15 Spinning Wheel Road
Suite 310
Hinsdale, IL 60521
(630) 654-9547
pro hac vice